Mark L. Javitch (CA SBN 323729)
JAVITCH LAW OFFICE
480 S. Ellsworth Ave
San Mateo, CA 94401
Telephone: (650) 781-8000
Facsimile: (650) 648-0705
mark@javitchlawoffice.com
*Attorney for Plaintiffs*
*and the Putative Classes*

[Additional attorneys listed on signature page]

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN JOSE DIVISION

| | |
|---|---|
| MOBILE EMERGENCY HOUSING CORP., and TRACK RAT ENTERPRISES, INC. d/b/a PERFORMANCE AUTOMOTIVE & TIRE CENTER, and DAVID JUSTIN LYNCH, individually and on behalf of all others similarly situated,<br><br>Plaintiffs,<br><br>v.<br><br>HP, INC. d/b/a HP COMPUTING AND PRINTING INC., a Delaware Corporation,<br><br>Defendant. | Case No.:  5:20-cv-09157-SVK<br><br>**FIRST AMENDED CLASS ACTION COMPLAINT**<br><br>**DEMAND FOR JURY TRIAL** |

1    Plaintiffs MOBILE EMERGENCY HOUSING CORP., TRACK RAT ENTERPRISES, INC.

2    d/b/a PERFORMANCE AUTOMOTIVE & TIRE CENTER, and DAVID JUSTIN LYNCH (collectively,

3    "Plaintiffs"), individually and on behalf of others similarly situated, bring this First Amended Class Action

4    Complaint against Defendant HP, INC. d/b/a HP COMPUTING AND PRINTING INC. ("HP" or

5    "Defendant") and make the following allegations based on personal knowledge as to facts pertaining to

6    their own experiences and on information and belief as to all others:

### NATURE OF THE ACTION

1.    HP wrongfully compels users of its printers to buy and use only HP ink and toner supplies by transmitting firmware updates without authorization to HP printers over the Internet that lock out its competitors' ink and toner supply cartridges. HP's firmware "updates" act as malware—adding, deleting or altering code, diminishing the capabilities of HP printers, and rendering the competitors' supply cartridges incompatible with HP printers. As a result, and by HP's design, Plaintiffs and the Class members who reasonably and lawfully buy competitors' much less costly and equally effective supplies are left with useless printers and supply cartridges.

2.    HP's malware transmission is unannounced, automatic (on the part of printer owners), and unsolicited. The firmware update, or the portion of the firmware update that renders third-party ink and toner incompatible with HP printers, serves no legitimate business purpose. Even if other portions of the transmission had some arguable security or quality benefit, the secretive, automatic, and misleading manner in which the firmware updates are carried out unlawfully deprive Plaintiffs and the Class of the fully informed choice of either choosing to accept the firmware update and the represented benefits accompanying it, or to decline the update and receive the benefits of using ink or toner of their choice.

3.    As a result of HP's malware, HP printer owners who lawfully use significantly less expensive ink or toner purchased from third parties are forced to buy HP cartridges, which HP sells at substantial premiums, or they are deprived of the use of their printers until third parties can develop work arounds to again offer products in competition with HP. HP harms competition because it deprives its printer users of the choice whether to purchase more expensive HP supplies or the less expensive supplies of lawful competitors.

4.     Even though HP sells ink and toner at substantial premiums over its competitors, HP is able to maintain its market share in the HP printer-compatible ink and toner supply markets only because it has the exclusive ability to install firmware updates to the printers it sells that are connected to the Internet.

5.     In furtherance of the unlawful scheme, HP falsely represents and omits material facts regarding the reason for the sudden inability of its printers to function without HP ink and toner. HP printers using third party ink and toner cartridges display an error message stating that the printer had a "supply problem." In fact, there was no supply problem until HP intentionally caused one by sending malware to its printers to render third-party supplies incompatible with its products.

6.     The incompatibility was not an unintended consequence of HP pursuing or implementing its legitimate business interests or conducting lawful quality assurance, security updates, or product improvements. The incompatibility was the point of the firmware update, or the portion of the firmware update that caused the incompatibility to prevent its printers from working with competitors' products. Third-party supplies are not collateral damage; they are the target.

7.     Due to the transmission and by HP's design, Plaintiffs' and Class members' Class Printers and supply cartridges were rendered incompatible and inoperable. Plaintiffs would continue to use their Class Printers with non-HP toner supply cartridges if given the opportunity to do so without the risk of future malware transmissions from HP. Plaintiffs would not have purchased an HP printer had they known HP was engaged in and would engage in such conduct. As a direct and proximate result of HP's misconduct, Plaintiffs and Class members sustained damages, including but not limited to the loss of the value of the supply cartridges they purchased that are no longer compatible with their printers, loss of time and effort to diagnose the damage to their printers and to determine what remedial measures to take, the need to purchase expensive HP supply cartridges, uncertainty in the functioning of their printers and supply cartridges, and future remedial costs.

8.     HP's malware transmission and false statements injured and will continue to injure its customers. HP's conduct is unlawful under federal and state laws prohibiting hacking and other computer crimes, state statutory prohibitions against deceptive and unfair trade practices, and trespass to chattels.

9.     Plaintiffs therefore seek actual, statutory, and exemplary damages, restitution, and an injunction requiring HP to reverse the effects of its malware transmissions insofar as they render once-compatible ink and toner cartridges obsolete, and prohibiting HP from sending such transmissions in the future without obtaining the fully informed prior consent of each printer owner.

## PARTIES

10.    Plaintiff MOBILE EMERGENCY HOUSING CORP. ("Mobile Emergency") is a domestic business corporation registered to do business and existing under the laws of the State of New York, with its principal place of business in Farmingdale, New York.

11.    Plaintiff TRACK RAT ENTERPRISES, INC. d/b/a Performance Automotive & Tire Center ("Performance Automotive") is a domestic corporation registered and existing under the laws of the State of Arizona, with its principal place of business in Mesa, Arizona.

12.    Plaintiff DAVID JUSTIN LYNCH is an individual residing in Palm Springs, California, and is a citizen of California.

13.    Defendant HP, INC. d/b/a HP Computing and Printing Inc. is a Delaware corporation with its principal place of business located at 1501 Page Mill Road, Palo Alto, California, 94304.

## JURISDICTION AND VENUE

14.    This Court has original subject matter jurisdiction under 28 U.S.C. § 1331, as the action arises under the Computer Fraud and Abuse Act, 18 U.S.C. § 1030 ("CFAA"). The Court has supplemental jurisdiction over Plaintiffs' state and common law claims under 28 U.S.C. § 1367(a). Alternatively, the Court has original subject matter jurisdiction over the state law claims pursuant to 28 U.S.C. § 1332(d), because the case is brought as a class action pursuant to Fed. R. Civ. P. 23, there are 100 or more members of the proposed Class, the amount in controversy exceeds $5,000,000, exclusive of costs, and Plaintiffs and Defendant are diverse parties.

15.    This Court has general personal jurisdiction over HP because HP's headquarters and principal place of business are located in Palo Alto, California.

16.    Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)(2) because HP resides in this District.

3
**FIRST AMENDED CLASS ACTION COMPLAINT**

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## INTRADISTRICT ASSIGNMENT

17.     Pursuant to Civil L.R. 3-2(c), this case is properly assigned to the San Jose Division because a substantial part of the events or omissions that give rise to Plaintiffs' and Class members' claims occurred in the County of Santa Clara, California.

## COMMON FACTUAL ALLEGATIONS

18.     HP is the largest seller of home, office, and enterprise printers in the United States and sells associated supply cartridges for its printers. HP employs a "razor and blades" business model, where the printer is sold at a substantial discount with the intent on profiting on the sales of consumable supplies like toner and ink over the lifetime of the printer. Under this model, the overall long term cost of owning and operating an HP printer compared to its competitors in the market for printers is difficult to evaluate for the customer at the point of sale.[1]

19.     HP's net revenue from supplies alone in 2019 was $12.9 billion. Consistent with its razor and blades model, its net revenues from hardware (*i.e.*, printers, among others) came to $7.1 billion in 2019.[2]

20.     HP depends on its extremely high-priced, recurring supply cartridge sales as the lifeblood of its business. Indeed, commentators have remarked that the price per ounce of HP's ink and toner range between the prices of silver and gold (at $4,731 per gallon).[3] HP's original supplies are so excessively priced that a recent check of Amazon.com found that the HP branded set of color toner supply cartridges (for one of the printers at issue in this lawsuit) were being offered for sale at a 711% (seven hundred

---

[1] *See* Anirudh Dhebar, "Innovating Around the Classic Razor-And-Blades Pricing Model" Babson College, April 2017. https://www.babson.edu/academics/executive-education/babson-insight/strategy-and-innovation/razor-and-blades-pricing-model/# (last accessed November 25, 2020).

[2] *See* 2019 10K, HP Inc. at 72. *Notes to Consolidated Financial Statements (Continued)*. https://s2.q4cdn.com/602190090/files/doc_financials/2019/ar/hp-inc_10-ka-(1).pdf (last accessed November 24, 2020).

[3] *See* Eduardo Porter, "Why Printer Ink Is the Other 'Black Gold.'" *All Things Considered*, NPR, May 24, 2012. https://www.npr.org/2012/05/24/153634897/why-printer-ink-is-the-other-black-gold. (last accessed November 25, 2020).

eleven percent) premium above several non-HP listings that had earned positive customer reviews. And this is to say nothing of the excessive shrinkflation HP supplies have undergone in recent years, which contributes to the value disparity.[4] Accordingly, HP admits in its annual report that it intends to keep its prices high, as its operating results could be adversely affected if it had to lower the prices of HP brand products.

21.     The critical component of a successful razor and blades business model is that the market for the consumable must be closed to competitors. If consumers can purchase blades from anyone else, then the model fails.

22.     As a result, HP fears competition in its "Printing Supply Business" from what it refers to as "independent suppliers" who offer "non-original supplies (including imitation, refill or remanufactured alternatives) for some of our LaserJet toner and Inkjet cartridges."[5] HP has warned that "[f]inancial performance could also decline due to increased competition from … non-original supplies[.]"[6] "For example, our supplies business has recently experienced declining revenues due to declines in market share, installed base and usage, and increased customer pricing sensitivity."[7]

23.     Competitors in the supplies market have continually eaten into the market share for HP-compatible ink and toner supply cartridges. As HP states in its 2019 annual report: "independent suppliers offer non-original supplies (including imitation, refill and remanufactured alternatives), which are often available for lower prices."[8] "Net revenue for Supplies decreased 4.8% as compared to the prior-year period, primarily due to demand weakness."[9]

---

[4] https://www.theguardian.com/money/2013/feb/23/printer-ink-cartridges-paying-more-getting-less (last accessed December 10, 2020).

[5] *Id*. at 12.

[6] *Id*. at 12.

[7] *Id*. at 13.

[8] HP, Inc. 2019 Form 10-K, at 7, available at
https://s2.q4cdn.com/602190090/files/doc_financials/2019/ar/hp-inc_10-ka-(1).pdf

[9] *Id*. at 42.

24.    Based on the competitive risks identified by HP, and to reverse its decline in supplies revenue, HP resorted to suppressing competition for its HP-branded ink and toner supply cartridges by sending malware to its customers' printers, causing a malfunction to its printers equipped with competitors' supply cartridges.

25.    HP has acknowledged the effects that its so-called supplies "authentication" procedures can have on its market share in supplies and has deployed "authentication" procedures, such as firmware updates, as a strategy to boost its market share in the supply markets.[10] "Authentication" is just a euphemism for sending firmware updates designed to kick off competitors' products.



26.    In or around late October and early November, 2020, HP caused to be transmitted a firmware update containing malware designed to lock out then-compatible third-party supply cartridges. HP wrote, designed, and transmitted the firmware or a portion thereof solely for the purpose of disabling third-party supply cartridges, which were successfully competing with its supplies business.

---

[10] *See* page 38, Strategic & Financial Plan for Value Creation (Feb. 24, 2020), attached as Ex. 99-2 to HP Inc. Form 8-K, submitted to Securities and Exchange Commission on Feb. 24, 2020.

27.    The malware caused damage to Plaintiffs' and Class members' printers. HP's conduct was unilateral, unsolicited, misleading, and deceptive. HP did not seek consent from, advise, or explain the malware or the update to Plaintiffs and Class members. HP simply transmitted the update. Plaintiffs and Class members did not authorize HP to transmit the update or to cause damage to their printers.

28.    In addition, HP made misrepresentations and omissions of material fact regarding the firmware update. At the point of sale, HP omitted material facts concerning its well-conceived business plan to periodically disallow competing supplies. After HP transmitted the updates, HP made false statements to conceal its role and the nature of the update. HP caused a message to be displayed claiming that the printer had a "supply problem" when a competitor's supply cartridge was installed. HP did not attribute the problem to a firmware update, malware transmission, or other conduct on its part.

29.    The error message that the printers displayed intentionally misrepresented the cause of the printer issue, suggesting that the third-party supply cartridges were broken when, instead, the transmission simply disabled the supply cartridges that had previously functioned satisfactorily and would have continued to function but for HP's transmission of the update.

30.    HP should have implemented reasonable, legal and ethical alternatives. HP should have played fairly in the marketplace using traditional methods, using persuasion and other legitimate sales tactics to convince Plaintiffs and the Class to choose to buy HP branded supply cartridges. HP should have emphasized quality, value, customer service, or other benefits, rather than secretly causing printers that were not contributing to HP's supplies revenue to malfunction. HP should have provided its customers with the opportunity to make a fully informed decision regarding whether to install the firmware update or continue using third party supplies.

**THE CLASS PRINTERS**

31.    HP's malicious transmissions affected many models of HP printers, as well as the corresponding third-party ink and toner supply cartridges that were in the printers or were already purchased by Plaintiffs and Class members at the time the update was transmitted or activated.

32.    Subject to information learned in discovery, the Class Printers comprise HP Color LaserJet printers and all-in-one devices, in the following non-exhaustive list of products and product series: HP

Color LaserJet Pro M254, HP Color LaserJet Pro MFP M280, HP Color LaserJet Pro MFP M281, and all other models affected by HP malware transmissions in the way described herein ("Class Printers").

**FACTS SPECIFIC TO MOBILE EMERGENCY**

33.     Mobile Emergency provides mobile housing to natural disaster victims and first responders in the United States and the Caribbean. Mobile Emergency also provides mobile facilities that are equipped for conducting quarantines.

34.     On August 21, 2019, Mobile Emergency, through its authorized representative, Joseph James ("James"), purchased an HP Color LaserJet Pro M254, for $238.96 from the Staples at 204 Airport Plaza, Farmingdale, New York.

35.     Mobile Emergency uses that device to print contracts that are mailed to clients.

36.     The printer came packaged with an initial set of model 202 HP-brand toner supply cartridges.

37.     Mobile Emergency would continue to use its Class Printer with reasonably priced non-HP toner supply cartridges. Had Mobile Emergency been informed that HP would intentionally transmit software updates to the printer over the Internet designed to render the printer incompatible with non-HP supplies, Mobile Emergency would not have purchased the printer.

38.     When the initial model 202 toner supply cartridges in Mobile Emergency's printer were exhausted, Mobile Emergency did not purchase additional supply cartridges from HP. Instead, on October 16, 2020, Mobile Emergency purchased a set of model 202 Greensky toner supply cartridges from Amazon.com for $52.49, because they were truthfully advertised at the time as being compatible with the HP printer. The model 202 Greensky cartridges were compatible with the printer and Mobile Emergency was satisfied with the quality of the printer's output.

39.     On or around November 18, 2020, HP sent or activated an unsolicited and malicious transmission to the printers of Mobile Emergency and the Class. The transmission altered the code and data of the Class Printers and rendered the printers incompatible with third-party toner supply cartridges, including Greensky cartridges purchased by Mobile Emergency.

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

40.     HP did not advise Mobile Emergency or the Class members of the transmission. Mobile Emergency discovered the effects of the malware transmission when James attempted to print a document, but an error message was displayed, as shown below:



41.     After HP's transmission, Mobile Emergency's fully functioning printer ceased printing.

42.     To check for a solution, James searched HP's website, but could find only a recommendation to replace the cartridge with an HP-branded cartridge.

43.     As a consequence of HP's intentional conduct, Mobile Emergency's printer and supply cartridges were disabled. The Greensky toner was and is useless. Mobile Emergency was effectively forced to purchase HP toner. Mobile Emergency bought a black HP toner from Staples on December 1, 2020 for $71.68. Mobile Emergency is now uncertain whether the decision in the future to buy third party toner will result in wasted toner and further losses.

44.     Mobile Emergency would continue to use its Class Printer with reasonably priced non-HP toner supply cartridges. Had Mobile Emergency known that HP was engaged in and would engage in the unlawful, deceptive, and unfair conduct as described herein, it would not have purchased an HP printer. As a result of HP's unlawful conduct, Mobile Emergency has and will continue to suffer injury in fact

and sustain losses in paying for HP printers it would not have bought had it known the truth, losing the value of third-party supply cartridges rendered useless as a result of HP's conduct, and incurring additional losses and injuries, such as buying replacement supplies and other consequential damages relating to loss of use of the HP printer.

## FACTS SPECIFIC TO PERFORMANCE AUTOMOTIVE

45.    Performance Automotive purchased an HP Color LaserJet Pro MFP M281fdw Laser Multifunction Printer from HP in November 2018.

46.    Performance Automotive, through its authorized representative Tony Staples, used 152,400 rewards points to purchase the device.

47.    The device's serial number is VNBNLCJ7JH.

48.    The device's packaging included an initial set of model 202 HP-brand toner supply cartridges.

49.    Performance Automotive would continue to use its Class Printer with reasonably priced non-HP toner supply cartridges. Had Performance Automotive been informed that HP would intentionally transmit software updates to the printer over the Internet designed to render the printer incompatible with non-HP supplies, Performance Automotive would not have purchased the printer.

50.    When the initial toner supply cartridges were exhausted, Performance Automotive did not purchase additional toner supply cartridges from HP. Instead Performance Automotive purchased model 202 GPC Image, Linkyo and Greensky toner cartridges from Amazon.com for approximately $60 per set, because they were truthfully advertised at the time as being compatible with its HP printer. The GPC Image, Linkyo and Greensky cartridges were compatible with the printer and Performance Automotive was satisfied with the quality of the printer's output.

51.    On or around November 18, 2020, HP sent or activated an unsolicited and malicious transmission to the printers of Performance Automotive and the Class. The transmission altered the code and data of the Class Printers and rendered the printers incompatible with third-party toner supply cartridges, including the GPC Image, Linkyo and Greensky cartridges purchased by Performance Automotive.

52.    HP did not advise Performance Automotive or the Class members of the transmission. Performance Automotive discovered the effects of the malware transmission when it attempted to print a document, but an error message was displayed, as shown below:



53.    After HP's transmission, Performance Automotive's fully functioning printer ceased printing. When Staples checked the printer, they saw that the BIOS version had been changed.

54.    Staples tried resetting and power cycling the device, but the error message persisted. Staples researched the problem and found that HP had issued a "Bios Update" that caused the printer to become "bricked."

55.    As a consequence of HP's intentional conduct, Performance Automotive's printer and supply cartridges were disabled. Performance Automotive purchased a printer from a different printer manufacturer to avoid further losses as a result of HP's unlawful conduct.

56.    Performance Automotive would continue to its Class Printer if it was able to operate with reasonably priced non-HP toner supply cartridges.  Had Performance Automotive known that HP was engaged in and would engage in the unlawful, deceptive, and unfair conduct as described herein, Performance Automotive would not have purchased an HP printer. As a result of HP's unlawful conduct, Performance Automotive suffered and continues to suffer injury in fact and sustain losses in paying for HP printers it would not have bought otherwise, losing the value of third-party supply cartridges rendered

useless as a result of HP's conduct, and incurring additional losses and injuries, such as buying replacement supplies and other consequential damages relating to loss of use of the HP printer.

### FACTS SPECIFIC TO DAVID JUSTIN LYNCH

57.     On March 3, 2020, David Justin Lynch purchased an HP Color LaserJet Pro M254dw Wireless Printer from Best Buy for $239.25.

58.     The device's packaging included an initial set of model 202 HP-brand toner supply cartridges.

59.     When the initial toner supply cartridges were exhausted, Lynch did not purchase additional toner supply cartridges from HP. Instead, on August 18, 2020, Lynch purchased a set of high capacity model 202 toner cartridges from Express-Inks for $215.46, because they were truthfully advertised at the time as being compatible with his HP printer. The Express-Inks cartridges were compatible with the printer and Lynch was satisfied with the quality of the printer's output.

60.     Lynch would continue using his Class Printer with reasonably priced non-HP toner supply cartridges. Had Lynch been informed that HP would intentionally transmit software updates to the printer over the Internet designed to render the printer incompatible with non-HP supplies, Lynch would not have purchased the printer.

61.     Around January 2021, HP sent or activated an unsolicited and malicious transmission to the printers of Lynch and the Class. The transmission altered the code and data of the Class Printers and rendered the printers incompatible with third-party toner supply cartridges, including the Express-Inks cartridges purchased by Lynch.

62.     HP did not advise Lynch or the Class members of the transmission. Lynch discovered the effects of the malware transmission when he attempted to print a document, but an error message was displayed:

63.     After HP's transmission, Lynch's fully functioning printer ceased printing.

64.     Lynch's printer displayed an error message as shown below that said: "Supply Problem."



65.     The device also displayed an error message as shown below stating "The indicated supplies are not communicating correctly with the printer. Try reinstalling the supplies. If the problem persists, replace the supplies to continue printing."

66.     As a consequence of HP's intentional conduct, Lynch's printer and supply cartridges were disabled.

13
**FIRST AMENDED CLASS ACTION COMPLAINT**

67.     As a consequence of HP's unlawful conduct, Lynch was forced to purchase HP-brand cartridges. Lynch had to spend nearly five hundred dollars more for these HP-brand toner cartridges to get the printer operating again.

68.     On January 13, 2021, Lynch paid $493.56 for new HP cartridges.  He purchased an HP brand double pack of black high capacity cartridges from Amazon for $189.97.  On the same day, he also purchased a set of three high capacity HP color cartridges for $303.59 from Amazon.

69.     Lynch would continue using his Class Printer with reasonably priced non-HP toner supply cartridges. Had Lynch known that HP was engaged in and would engage in the unlawful, deceptive, and unfair conduct as described herein, Lynch would not have purchased an HP printer. As a result of HP's unlawful conduct, Lynch suffered and continues to suffer injury in fact and sustain losses in paying for HP printers he would not have bought otherwise, losing the value of third-party supply cartridges rendered useless as a result of HP's conduct, and incurring additional losses and injuries, such as buying replacement supplies and other consequential damages relating to loss of use of the HP printer.

## COMPLAINTS FROM CLASS MEMBERS

70.     Numerous other Class members reported experiencing the same issue. Below are just some comments (unedited) on message boards and Internet forums regarding the problem:

- All was working fine until on printer display pop for upgrade and I chose to do it, right after that start getting "Supply Problem" error and won't print. Automatic diagnosis said "Print queue issue is not fixed" but printer display shows "Supply Problem." Did that software upgrade now protecting for me to use cheaper brand Toner? I even put a brand new set of Toners and the same issue. Always use aftermarket toner and no issue.[11]
- I am posting this on November 2, 2020. My HP 6960 All In One just stopped allowing 3rd party ink cartridges through Firmware update. To top it off, my local stores are out of tri-color cartridges & I had to order direct from HP. I'm so angry.[12]

---

[11] https://h30434.www3.hp.com/t5/Printing-Errors-or-Lights-Stuck-Print-Jobs/HP-Color-Laser-jet-Pro-MFP-M281CDW-quot-Supply-Problem-quot/td-p/7844016

[12] https://borncity.com/win/2019/01/20/does-hp-blocks-3rd-party-ink-cartridges-again-on-its-printers-jan-2019/#comment-12712

- November 6, 2020 – my HP color LaserJet Pro MFP M281fdw got a pushed firmware update today, and now my third party cartridges won't work. The printer is essentially a brick now. The screen says "supply problem."[13]

- November 7, 2020, LaserJet Pro M254dw just updated firmware and have run into exactly this problem. Printer was working fine with 3rd party cartridges before the update and now says it has supply problems. Installed a genuine HP black cartridge and still have the same block. It's a shame as I was really happy with the printer before this and now it's a liability.[14]

- My HP MFP M281fwd has the same problem. Just replaced HP cartridges with 3rd party cartridge and now i cannot print anymore. Really frustrating. Some comment on HP Support says that downgrade of firmware is not possible. Would appreciate very much if someone finds a unbrick….[15]

## CLASS ALLEGATIONS

71.     **Class Definition**: Plaintiffs brings this action pursuant to Federal Rule of Civil Procedure 23(b)(2) and 23(b)(3) on behalf of Plaintiffs and the Classes defined as follows:

> **Device Owner Class.** All persons and entities in the United States who own a Class Printer.

> **Damages Subclass**. All persons and entities in the United States who own a Class Printer that displayed a diagnostic error, such as "Supply Problem" or other similar error code, as a result of HP's transmission of a firmware update.

> **State Consumer Subclass.** All persons and entities residing in California and States with a similar consumer protection statute to Cal. Civ. Code 1770(a)(15), who own a Class Printer that displayed a diagnostic error, such as "Supply Problem" or other similar error code, as a result of HP's transmission of a firmware update.

72.     The following people and entities are excluded from the Classes: (1) any Judge or Magistrate presiding over this action and members of their families; (2) Defendant, Defendant's subsidiaries, parents, successors, predecessors, and any entity in which the Defendant or its parents have a controlling interest and its current or former employees, officers and directors; (3) persons and entities who properly execute and file a timely request for exclusion from the Classes; (4) persons and entities

---

[13] *Id.*

[14] *Id.*

[15] *Id.*

whose claims in this matter have been finally adjudicated on the merits or otherwise released; (5) Plaintiffs' counsel and Defendant's counsel; and (6) the legal representatives, successors, and assigns of any such excluded persons and entities.

73.     Plaintiffs reserve the ability to modify the definition of the proposed Classes before the Court determines whether class certification is warranted.

74.     The requirements of Federal Rules of Civil Procedure 23(a), 23(b)(2), and 23(b)(3) are met in this case.

75.     The Fed. R. Civ. P. 23(a) elements of Numerosity, Commonality, Typicality, and Adequacy are all satisfied.

76.     **Numerosity**: The exact number of members of the Classes is unknown and not available to Plaintiffs, but it is clear that individual joinder is impracticable. On information and belief, Defendant sent this transmission to thousands of Class Printers. Members of the Classes can be identified through Defendant's records or by other means.

77.     **Commonality:** Commonality requires that the Class members' claims depend upon a common contention such that determination of its truth or falsity will resolve an issue that is central to the validity of each claim in one stroke. Here, there is a common contention for all Class members to whom HP sent a transmission that caused damage to its customers' printers and supply cartridges.

78.     **Typicality**: Plaintiffs' claims are typical of the claims of other Class members in that Plaintiffs and the Class members sustained damages arising out of Defendant's uniform wrongful conduct in the form of its malicious transmission and malfunction, and the error message that misrepresented the cause of the malfunction.

79.     **Adequate Representation**: Plaintiffs will fairly and adequately represent and protect the interests of the Class members. Plaintiffs' claims are made in a representative capacity on behalf of the Class members. Plaintiffs have no interests antagonistic to the interests of the other members of the proposed Classes and are subject to no unique defenses. Plaintiffs have retained competent counsel to prosecute the case on behalf of Plaintiffs and the proposed Classes. Plaintiffs and Plaintiffs' counsel are committed to vigorously prosecuting this action on behalf of the Class members and have the financial resources to do so.

80.     **This case also satisfies Fed. R. Civ. P. 23(b)(2) - Policies Generally Applicable to the Class**: This class action is appropriate for certification because HP has acted or refused to act on grounds generally applicable to the Classes as a whole, thereby requiring the Court's imposition of uniform relief to ensure compatible standards of conduct toward the Class members and making final injunctive relief appropriate with respect to the Classes as a whole. Defendant's practices challenged herein apply to and affect the Class members uniformly, and Plaintiffs' challenge to those practices hinge on Defendant's conduct with respect to the Classes as a whole, not on facts or law applicable only to Plaintiffs.

81.     **This case also satisfies Fed. R. Civ. P. 23(b)(3) - Predominance**: There are many questions of law and fact common to the claims of Plaintiffs and the Classes, and those questions predominate over any questions that may affect individual Class members. Common questions and/or issues for the Classes include, but are not necessarily limited to the following:

    i.    Whether HP knowingly caused the transmission of a program, information, code, or command that caused damage to Class Printers and supply cartridges;

    ii.    Whether HP's conduct constitutes prohibited conduct under the CFAA, Cal. Bus. & Prof. Code § 17500, Cal. Penal Code § 502(c), Trespass to Chattels, and the fraudulent, unfair, and unlawful prongs of Cal. Bus. and Prof. Code § 17200;

    iii.    The method of calculation and extent of damages for Plaintiffs and the Class members;

    iv.    Whether Plaintiffs and the Monetary Relief Class members are entitled to restitution and, if so, in what amount;

    v.    Whether the Court should enter injunctive relief as requested herein on behalf of the Injunctive Relief Class.

82.     **Superiority**: This case is also appropriate for class certification because class proceedings are superior to all other available methods for the fair and efficient adjudication of this controversy as joinder of all parties is impracticable. The damages suffered by individual Class members will likely be relatively small, especially given the burden and expense of individual prosecution of the complex litigation necessitated by Defendant's actions. Thus, it would be virtually impossible for the individual Class members to obtain effective relief from Defendant's misconduct. Even if Class members could

mount such individual litigation, it would still not be preferable to a class action, because individual litigation would increase the delay and expense to all parties due to the complex legal and factual controversies presented in this First Amended Complaint. By contrast, a class action presents far fewer management difficulties and provides the benefits of single adjudication, economy of scale, and comprehensive supervision by a single Court. Economies of time, effort and expense will be enhanced, and uniformity of decisions ensured.

**COUNT I**
**Computer Fraud and Abuse Act**
**18 U.S.C. § 1030(a)(5)(A)**
**(On Behalf of Plaintiffs and the Device Owner Class)**

83. Plaintiffs incorporate paragraphs 1–82 as if fully set forth herein.

84. 18 U.S.C. § 1030(a)(5)(A) prohibits knowingly causing the transmission of a program, information, code, or command, and as a result of such conduct, intentionally causing damage without authorization, to a protected computer.

85. Mobile Emergency's HP Color LaserJet Pro M254 printer, Performance Automotive's Color LaserJet Pro MFP M281fdw printer, and David Lynch's HP Color LaserJet Pro M254dw printer are protected computers under 18 U.S.C. § 1030(e)(2)(B). The Class Printers are also protected computers under 18 U.S.C. § 1030(e)(2)(B).

86. HP sent or caused to be sent a transmission of a program, information, code, or command in the form of a firmware update to the Class Printers.

87. HP intentionally and knowingly sent or caused to be sent this transmission to the Class Printers.

88. HP did not have permission or authorization from Plaintiffs and the Class members to make any modifications to the Class Printers.

89. HP intentionally caused damage to the Class Printers. HP's transmission caused damage to the Class Printers by erasing, modifying, or altering the code that had enabled compatibility with third-party cartridges and disabling HP printers' ability to use third-party cartridges. HP caused damage by rendering Plaintiffs' and Class members' non-HP brand cartridges useless. Class Printers were and are

18
**FIRST AMENDED CLASS ACTION COMPLAINT**

useless if they are equipped with third-party supplies and of diminished capabilities and value permanently as a result of the incompatibility going forward.

90. HP did not have permission or authorization from Plaintiffs and the Class members to cause damage to the Class Printers.

91. As a direct and proximate result of this misconduct, HP caused damage to Plaintiffs and the owners of the Class Printers within the meaning of 18 U.S.C. § 1030(e)(8). The functioning of the printers were disrupted and a (false) error message was displayed on the printer screens.

92. Plaintiffs and the Class members also suffered losses within the meaning of the CFAA, 18 U.S.C. § 1030(e)(11). Plaintiffs' printers and cartridges were rendered inoperative, even though they still had remaining toner and were fully functioning prior to HP's firmware. Mobile Emergency had purchased Greensky toner supply cartridges for $52.49, which are now disabled. Mobile Emergency was forced to purchase one or more HP-authorized cartridges as replacements. Performance Automotive purchased multiple sets of GPC Image, Linkyo and Greensky supply cartridges, which are now disabled, for approximately $60 per set. Performance Automotive bought a printer from another manufacturer. David Lynch bought supply toner cartridges from Express-Inks worth $215.46 that were disabled, and after the HP firmware update, Lynch had to spend $493.56 to get his printer working again. Plaintiffs also have to pay to safely dispose of their unused and useless supplies.

93. The firmware transmission also caused loss by decreasing the market value of the printers of Plaintiffs and the Class generally, because the Class Printers are now lacking in certain functionality that they had previously. Plaintiffs had invested significant amounts in purchasing their Color Laser printers from HP, as they expected to use them for several years. Mobile Emergency purchased its HP printer new at a Staples retail store for $238.96. Performance Auto spent 152,400 rewards points on its HP printer. David Lynch spent $239.25 for his HP printer. Prior to the firmware transmission, these printers had a low total operating cost because they could function with a variety of cartridges at low cost. However, after the firmware transmission, these printers could only function with high-priced HP brand cartridges.

94. The firmware transmission also caused loss to Plaintiffs and Class members, as they had to expend money, time, and labor to investigate and repair disabled Class Printers.

95.     Based on HP's violation of the CFAA, Plaintiffs and Class members seek damages, injunctive and other equitable relief, and all other relief provided for under the law.

**COUNT II**
**Violation of the California Comprehensive Computer Data Access and Fraud Act,**
**Cal. Penal Code § 502**
**(On Behalf of Plaintiffs and the Device Owner Class)**

96.     Plaintiffs incorporate paragraphs 1–82 as if fully set forth herein.

97.     California Penal Code § 502 prohibits knowing and unauthorized access to computers, computer networks, and computer systems.

98.     Class Printers are "computers" and part of a "computer network" or "computer system" under this statute.

99.     HP's transmission is a "computer program or software" and "computer contaminant" under Cal. Penal Code §§ 502(b)(3) and (12).

100.     HP made "access" to the Class Printers under Cal. Penal Code § 502(b)(1) when it sent the malware transmission. HP caused the unauthorized access to all Class Printers from this jurisdiction and is thereby deemed to have personally accessed the Class Printers in this jurisdiction. Cal. Penal Code § 502(j).

101.     HP knowingly sent the transmission and knowingly modified, damaged, destroyed, recorded, or transmitted information on the Class Printers without the intent or permission of Plaintiffs and Class members.

102.     HP violated California Penal Code § 502 in at least the following respects:

a.     In violation of Cal. Penal Code § 502(c)(1), HP caused the Class Printers to display false error messages stating that there was a "supply problem." HP deployed these false error messages as a scheme to defraud, deceive, and extort Plaintiffs and Class members to purchase new toner supply cartridges from HP.

b.     In violation of Cal. Penal Code § 502(c)(4), HP accessed and without authorization added, altered, damaged, deleted, or destroyed Class Printers' data, programs, or software.

c.     In violation of Cal. Penal Code § 502(c)(5), by disabling Class Printers, HP caused the disruption and denial of computer services to authorized users, such as Plaintiffs and the Class members.

103.     As a direct and proximate result of this misconduct, HP caused damage to the Class Printers and Plaintiffs and the Class members suffered losses. Mobile Emergency's printer was purchased new at a Staples retail store for $238.96 and its set of Greensky toner supply cartridges were purchased for $52.49. Mobile Emergency's Greensky cartridges were rendered useless even though they had toner supply remaining at the time of HP's firmware activation, and Mobile Emergency was forced to purchase one or more HP-authorized cartridges as replacements because of HP's conduct. Performance Automotive purchased multiple sets of GPC Image, Linkyo and Greensky supply cartridges for approximately $60 per set. Performance Automotive's cartridges were rendered useless even though they had toner supply remaining at the time of HP's firmware activation. Performance Automotive bought a printer from another manufacturer. Plaintiffs have to pay to safely dispose of their unused and useless supplies.

104.     HP's transmission caused damage and loss to Plaintiffs and Class members, including by disabling Class Printers, eliminating or impairing Plaintiffs' and Class members' use of Class Printers, and depriving Plaintiffs and Class members of the ability to use non-HP supply cartridges in their Class Printers. Mobile Emergency was forced to purchase one or more HP-authorized cartridges as replacements for $71.68, but that did not fix the problem. Performance Automotive purchased multiple sets of GPC Image, Linkyo and Greensky supply cartridges, which are now disabled, for approximately $60 per set. Performance Automotive bought a printer from another manufacturer. David Lynch bought supply toner cartridges from Express-Inks worth $215.46 that were disabled, and after the HP firmware, Lynch had to spend $493.56 to get his printer working again. Plaintiffs also have to pay to safely dispose of their unused and useless supplies.

105.     The transmission also decreased the market value of the printers generally, because the Class Printers are now lacking in functionality they had previously. Plaintiffs had invested significant amounts in purchasing their Color Laser printers from HP, as they expected to use them for several years. Mobile Emergency purchased its HP printer new at a Staples retail store for $238.96. Performance Auto spent 152,400 rewards points on its HP printer. David Lynch spent $239.25 for his HP printer. Prior to the firmware transmission, these printers had a low total operating cost because they could function with

a variety of cartridges at low cost. However, after the firmware transmission, these printers could only function with high-priced HP brand cartridges.

106.    The firmware transmission also caused loss to Plaintiffs and Class members in them being forced to expend money, time, and labor to investigate and repair the disabled Class Printers and dispose of the disabled cartridges, which Plaintiffs and Class members would not have purchased had they known HP was engaged in and would engage in the conduct alleged herein.

107.    The CDAFA allows an individual who "suffers damage or loss by reason of a violation" of the statute to bring a private civil action. Cal. Penal Code § 502(e)(1).

108.    Based on HP's violation of Penal Code § 502, Plaintiffs and Class members seek recovery of economic damages, injunctive and other equitable relief, as well as reasonable attorney's fees and costs, and all other relief provided for under the law.

**COUNT III**
**California False Advertising Law**
**Cal. Bus. & Prof. Code § 17500**
**(On Behalf of Plaintiffs and the Device Owner Class)**

109.    Plaintiffs incorporate paragraphs 1–82 as if fully set forth herein.

110.    HP violated Cal. Bus. & Prof. Code § 17500 by using false and misleading statements, and material omissions, to promote the sale of HP's toner supply cartridges and otherwise "concerning any circumstance or matter of fact connected with the proposed performance or disposition of services."

111.    HP made material omissions regarding its business practice of using the pretext of updating the firmware on its printers as a scheme to disable third-party supplies from its systems unfairly and coerce Plaintiffs and Class members to buy HP supplies that are sold for substantial and unjustified premiums. Plaintiffs wanted to use their devices with reasonably priced non-HP toner supply cartridges. Had Plaintiffs and Class members known that HP employed such tactics, they would not have purchased a Class Printer in the first place.

112.    HP made uniform representations and material omissions that communicated to Plaintiffs and Class members that there was a supply problem when that was false – just moments before HP sent the transmission, there had been no problem. HP omitted the material fact that the purported supply

problem was caused by HP's intentional transmission of firmware designed to render third-party supplies incompatible with HP printers.  HP had a duty to disclose the truthful cause of the problem.

113.    HP knew, or in the exercise of reasonable diligence should have known, that its representations and omissions were false and misleading at the time it made them. HP deliberately provided false representations and omissions to prevent customers from learning the intentional and unlawful design of HP's firmware updates and authentication procedures and further inducing its customers to purchase new supply cartridges from HP.

114.    HP had a duty to disclose that its conduct would constitute a material defect that relates to the central function of the printer—*i.e.*, its ability to use supply cartridges to print on an ongoing basis.

115.    HP's false and misleading advertising statements deceived the general public.

116.    As a direct and proximate result of HP's misleading and false advertising, Plaintiffs and Class members have suffered injury-in-fact and have lost money and property.

117.    Plaintiffs and Class members reasonably relied to their detriment on HP's material misrepresentations and omissions regarding its firmware updates and the purported "supply problem."

118.    Plaintiffs were left with uncertainty as to the best course of action after seeing the false "supply problem" message. Plaintiffs and Class members had to either purchase a set of overpriced HP supply cartridges or throw away their HP printer and purchase a printer from another manufacturer. Unless the Court enjoins further unlawful acts by HP, Plaintiffs and Class members face uncertainty as to which of these choices would minimize their damage. Mobile Emergency tried purchasing a new HP black cartridge from Staples for $71.68, but that did not fix the problem. Performance Auto exhausted its efforts to correct the problem, and instead purchased a new printer. David Lynch needed to print right away, so he was forced to purchase a new set of HP cartridges from Amazon for $493.56. Of the moneys paid to Staples and Amazon, HP received the majority of those moneys.

119.    Plaintiffs and Class members seek to enjoin, under Bus. & Prof. Code § 17535, the violations described herein and to require HP to issue appropriate corrective disclosures and software fixes.

120.    HP's false advertising will continue to harm consumers unless and until it is enjoined.

121.     Plaintiffs and Class members therefore seek an order requiring HP to cease its false advertising and unlawful practices, provide full restitution of all monies HP derived from its false advertising, interest at the highest rate allowable by law, and an award of reasonable attorney's fees and costs under applicable law, including Code of Civil Procedure § 1021.5.

122.     Plaintiffs are entitled to and seek restitution, unjust enrichment, and public as well as private injunctive relief under this section.

**COUNT IV**
**California Unfair Competition Law – Fraudulent Prong**
**Cal. Bus. & Prof. Code § 17200**
**(On Behalf of Plaintiffs and the Device Owner Class)**

123.     Plaintiffs incorporate paragraphs 1–82 as if fully set forth herein.

124.     The fraudulent prong of California's Unfair Competition Law prohibits business practices that are likely to deceive the public.

125.     HP's practice of sending a transmission that disabled functioning supply cartridges and rendered the Class Printers less valuable, and then misrepresenting the cause of the malfunction at the expense of its competitors, is a practice that is likely to deceive members of the public. HP's omissions of its business practices from potential printer purchasers is likely to deceive members of the public.

126.     Plaintiffs were left with uncertainty as to the best course of action after seeing the false "supply problem" message. Plaintiffs and Class members had to either purchase a set of overpriced HP supply cartridges, or throw away their HP printer and purchase a printer from another manufacturer. Unless the Court enjoins further unlawful acts by HP, Plaintiffs and Class members face uncertainty as to which of these choices would minimize their damage. Mobile Emergency tried purchasing a new black cartridge from HP for $71.68, but that did not fix the problem. Performance Auto exhausted its efforts to correct the problem, and purchased a new printer. David Lynch needed to print right away, so he purchased a new set of HP cartridges for $493.56.

127.     HP's practices are fraudulent under this section because members of the public are likely to be deceived by this practice.

24
**FIRST AMENDED CLASS ACTION COMPLAINT**

128.    Plaintiffs and Class members own Class Printers and/or received HP's malware transmission, and thus the value of their printers has been decreased and third-party supplies have been destroyed.

129.    Plaintiffs have no adequate remedy at law because of the ongoing uncertainty as to the functioning of the printer and whether HP will try to interfere with the functioning of their printers again. Plaintiffs intend to purchase ink and toner supplies from third parties at a lower cost for use with their Class Printers if the requested injunctive relief is granted.

130.    Plaintiffs are entitled to and seek restitution, unjust enrichment, and public as well as private injunctive relief under this section.

**COUNT V**
**California Unfair Competition Law – Unfair Prong**
**Cal. Bus. & Prof. Code § 17200**
**(On Behalf of Plaintiffs and the Device Owner Class)**

131.    Plaintiffs incorporate paragraphs 1–82 as if fully set forth herein.

132.    The unfair prong of California's Unfair Competition Law prohibits unfair business practices that either offend an established public policy or that are immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

133.    HP's sending a malware transmission that caused a loss of functionality to its own customers, and then misinforming the customers about the cause of the damage, is a practice that offends an established public policy or that is immoral, unethical, oppressive, unscrupulous or substantially injurious to consumers.

134.    The utility of HP's transmissions and untrue statements are very low (as they are fraudulent and anti-competitive) and are vastly outweighed by the serious harm incurred by Plaintiffs and Class members.

135.    Any legitimate purpose or benefit of HP's conduct is substantially outweighed by the harm to consumers, competition, and the general public. There is no legitimate reason why HP should be allowed to secretly install firmware updates disabling previous capabilities without providing its customers a fully informed option to decline the update. There is no legitimate reason why HP should be allowed to obfuscate or deceive its customers about the reasons why their HP printers no longer work

with competitors' supplies and HP's role in bringing about the sudden cessation of functionality. If HP is truly conducting legitimate procedures, then it should inform the customer that the procedures will be conducted, or have been conducted, and not just make vague and misleading statements such as "supply problem" that conceal HP's active and purposeful role in bringing about the problem or provide no advice to customers other than to buy HP supplies at considerable premiums.

136.    Plaintiffs were left with uncertainty as to the best course of action after seeing the false "supply problem" message. Plaintiffs and Class members had to either purchase a set of overpriced HP supply cartridges, or throw away their HP printer and purchase a printer from another manufacturer. Unless the Court enjoins further unlawful acts by HP, Plaintiffs and Class members face uncertainty as to which of these choices would minimize their damage. Mobile Emergency tried purchasing a new black cartridge from HP for $71.68, but that did not fix the problem. Performance Auto exhausted its efforts to correct the problem, and purchased a new printer. David Lynch needed to print right away, so he purchased a new set of HP cartridges for $493.56.

137.    Plaintiffs and Class members have incurred and continue to incur damages that are actual and recognized by statute in the form of a damaged printer and destroyed toner supply cartridges, and loss of money or property.

138.    Plaintiffs have no adequate remedy at law because of the ongoing uncertainty as to the functioning of the printer and whether HP will try to interfere with the functioning of their printers again. Plaintiffs intend to purchase ink and toner supplies from third parties at a lower cost for use with their Class Printers if the requested injunctive relief is granted.

139.    Plaintiffs are entitled to and seek restitution, unjust enrichment, and public as well as private injunctive relief under this section.

**COUNT VI**
**California Unfair Competition Law – Unlawful Prong**
**Cal. Bus. & Prof. Code § 17200**
**(On Behalf of Plaintiffs and the Device Owner Class)**

140.    Plaintiffs incorporate paragraphs 1–82 as if fully set forth herein.

141.    The unlawful prong of California Business and Professions Code § 17200 prohibits any unlawful business practice.

142.    Each of HP's malicious transmissions constitutes a violation of 18 U.S.C. § 1030(a)(5)(A) of the CFAA, Cal. Penal Code § 502, California's False Advertising Law, and trespass to chattels, as described herein, and all constitute separate and cumulative violations of the unlawful prong of § 17200.

143.    Plaintiffs and Class members have incurred damages in the form of a devalued printer and ruined toner supply cartridges and lost money or property.

144.    Plaintiffs are authorized to pursue a private right of action against HP under § 17204.

145.    Plaintiffs have no adequate remedy at law because of the ongoing uncertainty as to the functioning of the printer and whether HP will try to interfere with the functioning of their printers again. Plaintiffs intend to purchase ink and toner supplies from third parties at a lower cost for use with their Class Printers if the requested injunctive relief is granted.

146.    Plaintiffs are entitled to and seek restitution, unjust enrichment, and public as well as private injunctive relief under this section.

### COUNT VII
**Trespass to Chattels**
**(On Behalf of Plaintiffs and the Damages Subclass)**

147.    Plaintiffs incorporate paragraphs 1–82 as if fully set forth herein.

148.    Plaintiffs and Class members owned, possessed, and used, and had a right to possess and use, their Class Printers and their supply cartridges that were designed to be used in these printers.

149.    HP wrongfully, intentionally, and without authorization interfered with the ownership, possession, and use of the Class Printers and Plaintiffs' and Class members' supply cartridges, by sending malware to Class Printers that disabled Class Printers containing non-HP cartridges and rendered those cartridges and Class Printers inoperable, and then by displaying an error message that lied about the cause of the problem.

150.    HP's wrongful and intentional interference with Plaintiffs' and Class members' ownership, possession, and use of their Class Printers and non-HP cartridges was without authorization and caused damage to Plaintiffs and Class members, including by preventing the Class Printers from operating, by impairing the condition of these printers, by reducing the value of these printers, destroying the value of their non-HP supply cartridges, and by depriving Plaintiffs and Class members of the use of the Class Printers for a substantial period of time. A reasonable person would be willing to pay significantly less

for a Class Printer and would pay nothing for the cartridges now converted to a waste product that must be disposed of.

151.    Plaintiffs and the Class members are entitled to injunctive relief, restitution, unjust enrichment, and damages.

152.    Plaintiff is entitled to injunctive relief ordering HP to stop interfering and threatening to interfere in the ownership interest in their private property—*i.e.*, the printers and toner supply cartridges of Plaintiffs and the Class. Plaintiffs are also entitled to recover the amount by which HP's malware transmission harmed their ownership interests in the Class Printers and toner supply cartridges.

**COUNT VIII**
**Violation of Cal. Civ. Code § 1770(a)(15)**
**California Consumers Legal Remedies Act ("CLRA")**
**(Injunctive Relief on Behalf of Plaintiff David Lynch and the State Consumer Subclass)**

153.    Plaintiff incorporates paragraphs 1–82 as if fully set forth herein.

154.    The CLRA prohibits twenty-seven enumerated unfair business practices.

155.    Cal. Civ. Code § 1770(a)(15) of the CLRA prohibits representing that a part, replacement, or repair service is needed when it is not.

156.    Defendant violated Cal. Civ. Code § 1770(a)(15) when it falsely told Plaintiff that his cartridges needed to be replaced, when it was actually HP's misconduct that caused the malfunction.

157.    As a result of this violation, on January 13, 2021, Plaintiff incurred damages in the form of having his Express-Inks (worth $215.46) ruined and being forced to spend $493.56 on new HP cartridges. His printer also decreased in value as a result of not being able to function with non-HP cartridges.

158.    Under Cal Civ. Code § 1781(a), any consumer who suffers damage as a result of a violation of this section may bring a class action on behalf of himself and all those similarly situated.

159.    On February 9, 2021, pursuant to Cal. Civ. Code § 1781(a)(1) and (2), Plaintiff sent notice of the violation and demand for correction to HP's Palo Alto headquarters via certified mail, return receipt requested. Plaintiff reserves the right to amend his CLRA claim to seek damages as allowed by law.

160.    Plaintiff has no adequate injury at law because he is currently unable to determine whether he will be able to use third party cartridges in the future, and he is uncertain whether HP will attempt to interfere in his use of printer. Plaintiff was left with uncertainty as to the best course of action after seeing

28
**FIRST AMENDED CLASS ACTION COMPLAINT**

the false "supply problem" message. Plaintiff and Class members had to either purchase a set of overpriced HP supply cartridges or throw away their HP printer and purchase a printer from another manufacturer. Unless the Court enjoins further unlawful acts by HP, Plaintiffs and Class members face uncertainty as to which of these choices would minimize their damage. Plaintiff needed to print right away, so he purchased a new set of HP cartridges from Amazon for $493.56. HP benefitted substantially from Plaintiff's purchase because HP received the majority of the revenue from the purchase

161.    Therefore, Plaintiff and the Subclass are entitled to injunctive relief.

## PRAYER FOR RELIEF

**WHEREFORE**, Plaintiffs, individually and on behalf of the Classes defined above, pray for the following relief:

A.    An order certifying the Classes as defined above, appointing Plaintiffs as the representatives of the Classes, and appointing Plaintiffs' counsel as Class Counsel;

B.    An order declaring that Defendant's actions, as set out above, violate the CFAA under 18 U.S.C. § 1030(a)(5)(A);

C.    An order declaring that Defendant's actions, as set out above, violate California Penal Code § 502(c)(1), (4) and (5);

D.    An order declaring that Defendant's actions, as set out above, violate the California False Advertising Law, Cal. Bus. & Prof. Code § 17500;

E.    An order declaring that Defendant's actions, as set out above, violate the fraudulent, unfair, and unlawful prongs of the California Unfair Competition Law, Cal. Bus. & Prof. Code § 17200;

F.    An order declaring that Defendant's actions, as set out above, constitute Trespass to Chattels;

G.    An order declaring that Defendant's actions, as set out above, violates Cal. Civ. Code § 1770(a)(15);

H.    An injunction requiring Defendant to cease the unlawful business practices described herein and otherwise protecting the interests of Plaintiffs and the Classes, including requiring HP to reverse the effects of its malware transmissions insofar

as they render once-compatible ink and toner cartridges obsolete, and prohibiting HP from sending such transmissions in the future without obtaining the fully informed prior consent of each printer owner;

I.     An order awarding restitution, unjust enrichment, other equitable relief, and damages to Plaintiffs and the Classes, including punitive damages;

J.     An award of reasonable attorney's fees and costs pursuant to 18 U.S.C. § 1030, Cal. Civ. Proc. Code § 1021.5, and Cal. Penal Code §§ 502(e)(1) and (2).

K.     Such other and further relief that the Court deems reasonable and just.

## JURY DEMAND

Plaintiffs request a trial by jury of all claims that can be so tried.

Dated: March 2, 2021          Respectfully submitted,

MOBILE EMERGENCY HOUSING CORP., TRACK RAT ENTERPRISES, INC. d/b/a Performance Automotive & Tire Center, and DAVID JUSTIN LYNCH, individually and on behalf of all others similarly situated,

By:  /s/ Mark L. Javitch
Mark L. Javitch (California SBN 323729)
JAVITCH LAW OFFICE
480 S. Ellsworth Ave
San Mateo CA 94401
Telephone: (650) 781-8000
Facsimile: (650) 648-0705
*mark@javitchlawoffice.com*

By: /s/ Thomas A. Zimmerman, Jr.
Thomas A. Zimmerman, Jr. (IL #6231944)*
ZIMMERMAN LAW OFFICES, P.C.
77 W. Washington Street, Suite 1220
Chicago, Illinois 60602
Telephone: (312) 440-0020
Facsimile: (312) 440-4180
*tom@attorneyzim.com*
*Admitted *Pro Hac Vice*

*Attorneys for Plaintiffs and the Putative Classes*